UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARY BETH LAMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-cv-1780-DFH-JMS |
| | ) | |
| VISION CARE HOLDINGS, LLC, d/b/a | ) | |
| EYEGLASS WORLD, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Mary Beth Lamb has sued her former employer, Vision Care Holdings, LLC (doing business as Eyeglass World, LLC), alleging that defendant terminated her because of her age in violation of the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and because of her race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* She also claims defendant retaliated against her for reporting what she believed to be sex discrimination. Defendant Vision Care/Eyeglass World denies Lamb's allegations and has moved for summary judgment on all claims. For the reasons explained below, defendant's motion for summary judgment is granted in part and denied in part. Viewed in the light reasonably most favorable to plaintiff, the evidence would allow a jury to find that defendant discriminated against Lamb on the basis of age and sex and retaliated against her for challenging what she

believed was discrimination.  Lamb is not entitled to relief based on certain time-barred alleged discriminatory acts.

### Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment should be granted only where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Only genuine disputes over material facts can prevent a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  *Id.*

In deciding a motion for summary judgment, the court may not make credibility determinations, weigh the evidence, or choose from among different reasonable inferences that might be drawn from the evidence.  *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (reversing summary judgment); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (reversing summary judgment).  "[B]ecause summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to

believe." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court must view the evidence in the light reasonably most favorable to the non-moving party, giving her the benefit of conflicts in the evidence and the most favorable reasonable inferences. *Paz*, 464 F.3d at 664; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 (7th Cir. 2006). The court's only task is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920. Accordingly, the factual statements in this decision are not necessarily accurate in an objective sense, but they reflect the evidence in light of the summary judgment standard.

*Facts for Summary Judgment*

I.   *The Parties*

Eyeglass World, LLC, is a national chain of retail stores where customers can purchase an eye exam, lens prescription, and eyewear. The relevant chain of command runs upward from a store general manager to an area manager, a regional manager, and then the national sales director. Eyeglass World was originally owned and operated by Musa Holdings, Inc. In November 2003, defendant Vision Care Holdings, LLC, purchased the assets of Musa Holdings and began operating Eyeglass World as a wholly owned subsidiary.

Plaintiff Mary Beth Lamb began working as a store manager for Eyeglass World in December 2000, while the company was still owned by Musa Holdings.

Musa Holdings promoted Lamb to area manager in July 2002.  Lamb Dep. 42-43.
As area manager, Lamb was responsible for handling customer service issues as
well as training and hiring staff and managers for several stores.  *Id.* at 39.  After
one year as an area manager, Lamb was again promoted to the position of regional
manager.  *Id.* at 43.

When Vision Care purchased Eyeglass World in November 2003, Ben Cook
became Vision Care's president, CEO, and CFO.[1]  Cook Aff. ¶ 3.  After the change
in ownership, Lamb was re-interviewed for her regional manager position.  Lamb
Dep. at 44.  Lamb continued as regional manager under Vision Care's ownership.
Her immediate supervisor at this point was Kris Schrage.

II.   *Lamb's Concerns Regarding Disparate Pay*

From November 2003 through April 2004, Eyeglass World regional manager
Tim Blevins (male) was paid approximately $4000 more per year than Lamb.  Cook
Aff. ¶ 6.  Cook, Schrage, and Vision Care Holdings human resources director Alan
Fromowitz decided in April 2004 to raise Lamb's annual salary from $75,000 to

---

[1]Defendant has failed to make clear the nature and extent of Cook's
involvement with Eyeglass World and Musa Holdings prior to Vision Care's
takeover in November 2003.  There is evidence that Cook had at least some role
in the operation of the Eyeglass World chain even before Vision Care Holdings
assumed ownership.  For example, an Eyeglass World internal employment
memorandum dating from July 2003 was copied to Ben Cook, among others.  Pl.
Ex. W.  Because this unexplained evidence must be read in the light most
favorable to the non-moving party, the court assumes for purposes of summary
judgment that Cook had decision-making authority on personnel matters under
the ownership of both Musa Holdings and Vision Care.

$85,000.  *Id.*, ¶ 7.  Lamb believed, however, that she was still being paid less than other male co-workers.  Lamb Dep. 176.  Lamb testifies that she believed regional manager Guy Lauefer[2] had received a larger bonus while she had not, and that Blevins was paid more despite managing fewer stores.  *Id.*  She testified that she complained formally to both Cook and Schrage in July 2004 about these disparate pay concerns.  *Id.*  In January 2005, Cook moved to equalize the pay of all regional managers.  Cook Aff. ¶ 8.

III.    *Lamb's First Written Discipline*

In September 2004, two months after she complained about her pay, Vision Care/Eyeglass World issued Lamb the first warning of her career for: "Unprofessional conduct and inappropriate use of Company e-mail which is a violation of company policy."  Pl. Ex. G.  Attached to the written warning was a series of email exchanges between Lamb and two Eyeglass World store managers, Adam Parmeter and John Wilson.  The bulk of the emails, many of which contained language that was sexual in nature and incorporated terms of affection ("love, adam," "hugs") were written by Parmeter and Wilson.  Lamb was the only employee who was disciplined.  Vision Care/Eyeglass World labeled this initial warning as "Final" and indicated that if this violation happened again, the consequence would be "Further disciplinary action up to and including termination."  *Id.*  According to Vision Care CEO Cook, however, Eyeglass World

---

[2]The briefs and record contain at least three different spellings of this individual's name.  The court uses "Lauefer" throughout.

employs a progressive disciplinary policy. This policy consists of four sequential steps: a verbal warning, a written warning, a second written warning, and a final warning. Cook Dep. 63.

IV.    *Transfer Incident*

At about the same time, in approximately September 2004, several members of Vision Care/Eyeglass World management (Lamb, Schrage, Fromowitz, and Larry Neal) made the decision to transfer and promote an Eyeglass World store manager, Eric Corbin. Lamb was the only female among the individuals involved in this decision. Vision Care CEO Cook learned of this transfer during an October 2004 conference call, and he was not happy about it. Cook was upset that he did not have the chance to approve the transfer and promotion. Though Schrage, Fromowitz, and Neal were also on this call, Lamb was the only one who told Cook about this transfer. Lamb testified that near the end of the call, when Cook thought she was no longer present, Cook stated, "the bitch is gone." Lamb Dep. 99-100. Lamb was the only female on the conference call.

About one week after the conference call, Lamb received a second written warning notice. The notice warned that Lamb violated company expectations in regards to "Insubordination." Pl. Ex. I. According to the warning, Lamb failed to comply in a timely manner to Cook's request for a "store visit checklist." *Id.*

V.    *Employee Concerns Regarding Abusive Behavior by Regional Managers*

In the summer of 2004, Cook learned that several store managers had been complaining about the use of disparaging language and behavior by Lamb and Randy Middleton, a younger male regional manager.  Cook Aff. ¶ 10.  Eyeglass World employees complained that Lamb treated male employees more favorably, Pl. Ex. B-C, told one employee to "pull your head out of your ass," Pl. Ex. D, and generally took issue with Lamb's management style.  Middleton was accused of making derogatory comments to black employees, such as telling them they were "slumming," Pl. Ex. P, and addressing them as "monkeys."  Pl. Ex. Q.

Lamb compares her treatment to that of Middleton.  After both complaints concerning Middleton, Vision Care/Eyeglass World completed a "Confidential Harassment Investigation."  On May 20, 2004, four days after defendant made its investigation into the first complaint against Middleton, it gave him a "1st Written" warning, citing a "violation of company policy/procedure."  Pl. Ex. R.  The stated reason for the warning was that one of the stores under Middleton's watch had received poor scores during a secret evaluation.  *Id.*  On May 28, 2004, five days after defendant completed its investigation into the second complaint against Middleton, it gave him a "2nd Written" warning.  Pl. Ex. S.  The stated reason for this warning was "violation of company policy/procedure" and "performance/work quality."  Pl. Ex. S.  The same day, defendant gave Middleton a "Final" warning, again for "violation of company policy/procedure" and "performance/work

quality." Pl. Ex. T.  In June 2004, Middleton was terminated.  The stated reason for his termination was "restructure of company."  Pl. Ex. U.

Vision Care/Eyeglass World did not perform any confidential harassment investigations into the complaints against Lamb or address her alleged infractions through its progressive disciplinary policy.  It opted instead to send her to "HR Doctor," a human resources counseling service, in October 2004.  Def. Ex. 19. According to Vision Care human resources director Alan Fromowitz, Lamb was told that she would be fired if Vision Care/Eyeglass World received any further reports from subordinates about disparaging remarks or behavior.  Fromowitz Aff. ¶ 10.

VI.    *Post-Counseling Complaints Against Lamb*

Following Lamb's October 2004 counseling session, several employees filed further complaints against her.  In January 2005, Crystal Mansour complained that Lamb was not coaching her or giving her any help.  Pl. Ex. L.  February 2005, Scott Fero complained that Lamb told him he had "no balls."  Pl. Ex. K.  Fero also claimed Lamb called one co-worker a "f***ing bitch."  Pl. Ex. O.  Also in February, Patrick Rodriguez claimed that Lamb told him to "get some balls."  Pl. Ex. N. There is no evidence defendant conducted any investigations into the truth of these claims.  Vision Care CEO Ben Cook terminated Lamb in February 2005. Cook Aff. ¶¶ 12-13.

*Discussion*

I.   *Vision Care Holdings as a Defendant*

Vision Care is the parent company of Eyeglass World, which in turn employed Lamb.  Vision Care argues that Lamb should be allowed to proceed only against the Eyeglass World entity.  There are three ways in which Vision Care could be found to be a proper defendant in a discrimination case:  (1) if Lamb presents evidence that Vision Care itself maintained an employment relationship with her; (2) if Lamb can show that Vision Care forfeited its limited liability with regard to Eyeglass World; or (3) if Lamb presents evidence that successor liability applies.  *Worth v. Tyer*, 276 F.3d 249, 259-60 (7th Cir. 2001).

Looking more closely at the second possibility, an affiliated business entity like Vision Care can forfeit its limited liability in the discrimination context when "it takes actions for the express purpose of avoiding liability under the discrimination law or where the affiliate corporation might have *directed the discriminatory act*, practice, or policy of which the employee is complaining."  *Id.* at 260, citing *Papa v. Katy Ind., Inc.*, 166 F.3d 937, 941 (7th Cir. 1999) (emphasis added).  Defendant's own evidence shows that Ben Cook, the president, CEO, and CFO of Vision Care Holdings, was directly responsible for terminating Lamb.  Cook Aff. ¶ 12-13.  Because the CEO of Vision Care admits that he directed the act that Lamb claims was discriminatory, Vision Care is a proper defendant.

II.    *Age and Sex Discrimination Claims*

    A.    *Lamb's Prima Facie Case of Discrimination*

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  The ADEA makes it unlawful for a covered employer to discharge any individual because of her age if she is at least 40 years old.  29 U.S.C. §§ 623(a), 631(a).  Lamb was over 40 years old at all relevant times.

A plaintiff bringing an employment discrimination claim under the ADEA and Title VII may prove her claim using either or both of the "direct" and "indirect" methods of proof.  See *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003).   Lamb proceeds under the indirect method and must offer evidence supporting a prima facie case of discrimination.  See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The familiar *McDonnell Douglas* approach requires a plaintiff to offer evidence that:  (1) she was a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) other, similarly situated employees who were not members of the protected class were treated more favorably.  *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000).  If the employee offers evidence supporting a prima facie case, a presumption of discrimination arises, and the

burden shifts to the employer to articulate a legitimate, non-discriminatory reason for taking the adverse employment action.  *Id.*  If the employer provides such a reason, the burden then shifts back to the employee to present evidence that would allow a jury to find that the employer's stated reason is a false pretext, a lie, from which a jury might infer that the real reason was unlawful discrimination. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806-07 (7th Cir. 1999); *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

There is no dispute as to the first and third prongs of Lamb's prima facie case.  Lamb is a woman who was over the age of 40 during the relevant time period.  She suffered an adverse employment action when Vision Care CEO Cook terminated her employment in February 2005.  Defendant argues that Lamb cannot meet the remaining prongs of her prima facie case.  According to defendant, Lamb cannot show she was meeting its legitimate performance expectations because she continued to draw complaints from other employees for her abusive behavior.[3]

It is undisputed that a number of employees complained about Lamb's use of abusive and derogatory language.  Lamb argues that Vision Care/Eyeglass World's response when it received these complaints about her was less favorable than its response to similar complaints about a younger male co-worker.  Because

---

[3]Vision Care/Eyeglass World also presents this as its legitimate non-discriminatory reason for her firing.

Lamb offers evidence to support an inference of discriminatory discipline, as discussed below, the second element of the prima facie case essentially drops out or merges into the fourth element, so that the plaintiff must show that she was treated less favorably than other persons not in the protected class who committed similar violations.  *E.g.*, *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 728 (7th Cir. 2004), citing *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002), and *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999).

To show that she was treated less favorably than a similarly situated younger and/or male employee, Lamb must show that she was situated similarly with respect to performance, qualifications, and conduct.  *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000).  This normally requires a showing that both employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or their employer's treatment of them.  *Id.* at 617-18, citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  It is important not to draw this comparison too narrowly, however.  As the Seventh Circuit has pointed out, "an employee need not show complete identity in comparing himself to the better treated employee . . . ."  *Id.* at 618, citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); see also *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (reversing summary judgment for employer; similarly-situated inquiry is

flexible, considers all relevant factors, and calls for common sense rather than a "magic formula").

Lamb compares herself to Randy Middleton for these purposes.  Middleton is a younger male who also worked as a regional manager for Eyeglass World during the same period as Lamb.  Both Middleton and Lamb answered to the same immediate supervisor, Kris Schrage, and the same ultimate decision-maker, Vision Care CEO Ben Cook.  In the summer of 2004, Cook learned that both were accused of using inappropriate and disparaging language with subordinates. Cook Aff. ¶ 10.  Middleton was accused of making derogatory comments directed at black employees, such as telling them they were "slumming," Pl. Ex. P, and addressing them as "monkeys."  Pl. Ex. Q.

After learning about the employee complaints against Middleton, defendant completed two "Confidential Harassment Investigations" to verify whether the complaints were true.  Pl. Ex. P, Q.  It made no such investigations into any of the complaints filed against Lamb.  There is also evidence that Vision Care/Eyeglass World management set Lamb and Middleton on two distinct disciplinary tracks in response to their respective complaints.   Eyeglass World had a progressive disciplinary policy in place, where employees receive a verbal warning, two written warnings, and a final written warning before termination.   Cook Dep. 63. Consistent with this policy, Middleton's file contains three written warnings issued before he was terminated.  Four days after defendant received the results of its

first Confidential Harassment Investigation, it issued the "1st Written Warning" to Middleton.  Pl. Ex. R.  According to this warning, the consequence of Middleton's failure to improve would be a "2nd written up to Final."  *Id.*  Five days after receiving the results of the second Confidential Harassment Investigation, defendant gave Middleton both a "2nd Written Warning" and a "Final" Warning. Pl. Ex. S, T.  Both of these listed "termination" as the next step.  In June 2004, one month after defendant issued the 2nd Written Warning and Final Warning, it terminated Middleton, though the stated reason was a company reorganization rather than any disciplinary reason.  Pl. Ex. U.[4]

In contrast to its by-the-book approach with Middleton, Vision Care/Eyeglass World gave Lamb only two written warnings in the course of her entire career, both on matters unrelated to her alleged abusive behavior.  See Pl. Ex. G.[5]  Dating from September 2004, defendant labeled the initial warning "Final," though it was the first warning Lamb had ever received.  Consistent with a final warning, Lamb had to improve or face:  "Further disciplinary action up to and including termination."  Pl. Ex. G.  In October 2004, Lamb received a "Final" warning for "Insubordination" relating to her failure to provide Cook with a timely

---

[4]Middleton's written warnings do not reference specifically his derogatory comments directed towards black employees.  The warnings instead refer to various performance issues, and "violation[s] of company policy/procedure."  Pl. Ex. R, S.  It is nevertheless reasonable to infer, given the close proximity of these warnings to the completion of the Confidential Harassment Investigations, that these warnings were in fact addressing Middleton's use of derogatory and racist language.

[5]This written warning was in regards to "Unprofessional conduct and inappropriate use of Company e-mail."  Pl. Ex. G.

requested report.  Pl. Ex. I.  The consequence of a repeat violation of this type was given as "Termination."  *Id.*

When allegations of Lamb's use of disparaging language came to light in the summer of 2004, defendant did not issue a written warning for this particular violation.  Lamb was instead sent to "HR Doctor," a human resources counselor, in October 2004.  Lamb was fired after defendant continued to receive complaints after she returned from counseling, though apparently without any investigation into the truth of the complaints.

Vision Care/Eyeglass World contends that Lamb was actually given "a far better shake" than Middleton.  Def. Reply at 9.  According to defendant, it singled Middleton out for down-sizing due to the employee complaints against him. Lamb, in contrast, was given a chance to save her job through counseling. Though defendant claims that Middleton was always destined for termination, the evidence indicates that it nevertheless gave him the benefit of its customary progressive disciplinary policy.[6]  Taking defendant's several written warnings to Middleton at face value, a reasonable inference (favorable to Lamb, on summary judgment) is that he could have saved his job at multiple points by heeding these warnings.

---

[6]According to Vision Care/Eyeglass World, it needed to cut one regional manager from its staff.  When complaints surfaced regarding both Middleton and Lamb, it chose to terminate Middleton to meet its need to down-size.

It is clear that defendant treated Middleton and Lamb differently, and the differences were both substantial enough and confusing enough that a jury will need to decide who was treated more favorably.  Viewing the evidence in the light reasonably most favorable to plaintiff Lamb, a reasonable jury could conclude that she was never given an equal chance.  Beginning with the very first (and "Final") written warning she received on an unrelated disciplinary issue, Vision Care/Eyeglass World pushed Lamb immediately to the precipice of termination. Moreover, Lamb was never given *any* written warnings regarding her use of abusive and derogatory language towards employees.  Deviating from its usual policy, defendant effectively treated her counseling session with HR Doctor as a replacement for a series of warnings, making this one event the first and last chance for Lamb to address her issues with abusive language and behavior before she was terminated.  See Fromowitz Aff. ¶ 10.  Nor does defendant's argument address the fact that it investigated the allegations against Middleton, but apparently declined to investigate fully similar allegations filed against Lamb.

The comparison of Lamb to Middleton would be sufficient to establish the prima facie case.  Lamb also, however, offers evidence that she was treated less favorably than Joe Sutherland, another younger male regional manager. Sutherland was accused of sexual harassment by a prospective Eyeglass World employee in June 2003.  Pl. Ex. V.  Around the same time, a number of Sutherland's subordinates accused him of making derogatory and inappropriate comments on the job.  Pl. Ex. X.  Following an investigation into the allegations,

defendant sent Sutherland to HR Doctor in October 2003.  Twelve days after Sutherland returned from counseling, one of his employees lodged another complaint with defendant's human resources department. Pl. Ex. BB. Sutherland was not terminated.

Defendant argues that Sutherland and Lamb were not comparable employees because ownership of the company changed between the respective post-counseling offenses of Sutherland and Lamb.[7]  Defendant argues that the new owner, Vision Care Holdings, holds its regional managers to higher standards than the previous owner had.   This argument would have more weight if Sutherland and Lamb answered to different sets of decision-makers, there is evidence that the relevant decision-maker, Ben Cook, remained the same through these two ownership periods.  See *supra*, at 4 n.1.

Finally, there is evidence that Vision Care/Eyeglass World singled Lamb out for sending inappropriate emails.  In September 2004, Lamb was given a "Final" warning for "inappropriate use of Company e-mail."  Pl. Ex. G.  Attached to the warning were a series of sexually suggestive emails sent between Lamb and two male employees, Adam Parmeter and John Wilson.   Though most of the

---

[7]The post-counseling complaint against Sutherland was lodged in October 2003, while the company was owned by Musa Holdings.  The post-counseling complaints against Lamb were received in February 2005, while Eyeglass World was owned by Vision Care.

inappropriate emails were actually authored by Parmeter and Wilson, Lamb was the only employee Vision Care/Eyeglass World disciplined.

B.    *Legitimate Non-Discriminatory Reason for Lamb's Termination*

The same evidence Lamb offers to establish her prima facie case of disparate punishment also serves to support her claim of pretext.  See *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir.2001) ("the issue of satisfactory job performance often focuses on the same circumstances as must be scrutinized with respect to the matter of pretext").  Defendant claims it fired Lamb because she persisted in using abusive and derogatory language toward employees even after the counseling.  On summary judgment, however, the court must read the evidence in the light most favorable to Lamb.  With this in mind, a reasonable jury could conclude that the only reason Lamb was in the precarious situation where a post-counseling complaint would seal her fate was Cook's disparate treatment of her compared to Middleton from the very outset.  At least one other employee (Sutherland) also received a post-counseling complaint but was nevertheless retained.  Moreover, Lamb has offered evidence that on at least one previous occasion (the email incident), Vision Care/Eyeglass World singled her out for punishment as opposed to male employees who played a greater role in the infraction.  Lamb has come forward with sufficient evidence to cast doubt on defendant's proffered explanation.

Lamb also offers additional circumstantial to bolster her claim that discrimination was the reason for her termination.  In October 2004, Lamb and several other Vision Care/Eyeglass World colleagues (all male) were involved in a decision to promote and transfer Eric Corbin, an Eyeglass World store manager. When Cook learned of the move, he took issue with the fact that Corbin had been promoted and transferred without his prior approval.  Though several employees were involved in the decision, Lamb alleges that Cook singled out her – the sole female – during a subsequent conference call.  At the end of the conference call, after Cook believed Lamb was no longer on the line, he allegedly stated, "the bitch is gone."  Lamb Dep. 99-100.  Eight days after this incident, Lamb was required to go to counseling, the last step before termination.  Because Lamb has offered evidence from which a jury could conclude that Lamb was sent to counseling and subsequently fired because of her sex and age, Vision Care/Eyeglass World is not entitled to summary judgment on this claim.

According to Lamb, Cook himself had a history of engaging in the same behavior that he claims to have found intolerable from Lamb.   During the conference call regarding Corbin's transfer, Cook allegedly told Lamb, "I don't give a s*** how you feel."  Lamb Dep. at 87-88.  Lamb testified that Cook often told his regional managers that his "balls were on the table."  *Id.* at 243-44.  In criticizing Lamb's performance statistics, Cook said that she would "need to bring it up or not let the door hit me in the ass on the way out."  While Cook may not be similarly situated to Lamb for purposes of establishing her prima facie case, his

own practice of using disparaging language casts doubt on the honesty of his explanation that he fired her for engaging in comparable behavior. Because a jury could reasonably find that Lamb has satisfied the elements of a prima facie case of both age and sex discrimination and has raised a genuine issue of material fact concerning whether the defendant's stated reason for firing her was a pretext, defendant's motion for summary judgment must be denied on those claims.

II.    *Title VII Retaliation Claim*

Title VII also prohibits employers from retaliating against employees who opposed an unlawful employment practice in violation of Title VII. See 42 U.S.C. § 2000e-3(a). Lamb also claims that her discipline and firing were motivated by a desire to retaliate against her for complaining to Cook and Schrage in July 2004 that she was being paid less than male co-workers. The Seventh Circuit identified two distinct methods of proving retaliation in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir. 2002). The first is to present direct evidence that the plaintiff engaged in protected activity and as a result suffered an adverse employment action. *Stone*, 281 F.3d at 644. The second is an adapted indirect method, which would require Lamb to show that she (1) engaged in the protected activity of reporting unlawful discrimination; (2) was performing her job in a satisfactory manner; (3) was subjected to an adverse employment action; and (4) "only [s]he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action." *Id.* If the employer presents no evidence in response, the plaintiff is entitled to summary judgment. However, if

the employer presents "unrebutted evidence of a noninvidious reason" for the adverse action, the employer is entitled to summary judgment.  *Id.*  Lamb relies on the indirect method to establish her retaliation claim.

A.    *Protected Activity*

Vision Care/Eyeglass World contends that Lamb did not establish a prima facie case of retaliation because she cannot show that she engaged in a statutorily protected activity.  According to defendant, Lamb could not have had a good faith belief that she was the victim of disparate pay, given that she was the company's highest paid manager when she lodged her complaint.  An employee engages in a statutorily protected activity when:  (1) she has a good faith belief that she is opposing a practice prohibited under Title VII, and (2) this belief is objectively reasonable.  See *Hamner v. St. Vincent Hosp. & Health Care Center, Inc.*, 224 F.3d 701, 707 (7th Cir. 2000).  Defendant has offered no authority for the argument that Lamb could not have a good faith belief that it engaged in unlawful discrimination simply because she was on equal or better footing than her male counterparts *at the time*.  As Vision Care/Eyeglass World itself acknowledges, it paid at least one other male Eyeglass World regional manager (Tim Blevins) $4000 more than Lamb through April 2004 (three months before she field her complaint).  This provides an objectively reasonable (and at the time, possibly actionable) basis for believing that Vision Care/Eyeglass World might have violated Title VII.  Her July 2004 complaint was therefore a protected activity under Title VII.

B.     *Causal Connection*

Two months after Lamb complained about her pay disparity, she received the first written warning of her entire career with Eyeglass World.  Defendant correctly notes that warnings and reprimands alone do not amount to adverse employment actions.  See *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001).  If Lamb had only been given warnings, of course, that reasoning would be applicable, but she was fired.  A warning can constitute an adverse employment action when it is accompanied or followed by "tangible job consequences," and can provide evidence tending to show that truly adverse employment actions were motivated by illegal reasons.  See *id.*, quoting *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998).  That is the case here.  For Lamb, the consequence of this and subsequent disciplinary actions was her eventual termination.

Lamb has offered evidence of a causal link between her July 2004 disparate pay complaint and the September 2004 written warning.  "When an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the prima facie case is typically satisfied."  *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001).  Two months after Lamb lodged her complaint, she was subject to an adverse action.  There is other circumstantial evidence supporting the inference of a causal link as well.  See *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)

("suspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link").  Lamb went nearly four years without receiving any written discipline on the job, yet received her first write-up shortly after making her complaint.  There is evidence that defendant's stated reason for issuing this September 2004 warning was actually pretextual.[8] In contrast to the by-the-book approach Vision Care/Eyeglass World took in dealing with at least one other employee's inappropriate conduct (Middleton received first, second, and final warnings, each labeled as such), the first warning Lamb received was labeled "Final."  Finally, after Lamb lodged her complaint over disparate pay, Vision Care/Eyeglass World eventually implemented a policy eliminating disparities in pay among all regional managers in January 2005.  While none of these pieces of evidence are smoking guns, they are enough for a reasonable jury to find that Lamb's earlier complaint about pay led defendant to issue the September 2004 warning, paving the way for her eventual termination.

III.    *Time-Barred Discrimination Claims*

Vision Care/Eyeglass Glass is entitled to summary judgment, however, on Lamb's Title VII and ADEA claims with respect to any pay decisions it made that

---

[8]The September 2004 warning was for:  "Unprofessional conduct and inappropriate use of Company e-mail."  Lamb's apparent offense was participating in flirtatious exchanges over email with other employees.  The great bulk of these emails were only received, not written, by Lamb, yet she was the only employee singled out for discipline.  Also, while the language Lamb used in the few emails she authored was affectionate, she has testified that such affectionate language was common to email exchanges among Eyeglass World employees.

were time-barred by the time she filed her EEOC charge.  Title VII and the ADEA require plaintiffs to meet strict deadlines in order to preserve their claims: in Indiana, EEOC charges must be filed within 300 days of the alleged incident of race or sex discrimination, and within 180 days of the alleged incident of age discrimination.  *EEOC v. North Gibson School Corp.*, 266 F.3d 607, 617 (7th Cir. 2001) (ADEA), abrogated on other grounds, *EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002); *Minor v. Ivy Tech State College*, 174 F.3d 855, 857 (7th Cir. 1999) (Title VII).  Lamb waited until March 2005 to file her claims with the EEOC.  She therefore missed the deadline for challenging the difference in her pay compared to that of Tim Blevins, a difference which began in November 2003.  See *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2005) ("discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely field charges"); *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. —, —, 127 S. Ct. 2162, 2167 (2007) (applying *Morgan* to pay decisions made prior to the charge period).  While Lamb cannot recover based on this pay decision, she can use this event as background evidence in support of her other, timely claims.  *Morgan*, 536 U.S. at 113.[9]

Vision Care/Eyeglass World is also entitled to summary judgment on any Title VII or ADEA claims based on allegations of disparate pay as compared to

---

[9]The Supreme Court in *Ledbetter* left open the question whether the short statute of limitations under Title VII is subject to a discovery rule, as many other claims are.  See 550 U.S. at — n.10, 127 S. Ct. at 2177 n.10.  Lamb has not argued for a discovery rule in this case.

Eyeglass World employee Guy Lauefer.   Defendant argues that during the applicable charge period, Lamb actually received more compensation than Lauefer.   Lamb does not raise any argument in opposition and has thus waived the point.   See *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005).

IV.    *Title VII Punitive Damages and ADEA Liquidated Damages*

Vision Care/Eyeglass World has also moved for summary judgment on the issue of its liability for punitive damages under Title VII and liquidated damages under the ADEA, even if the principal claims survive summary judgment, as they do.   Under Title VII, Lamb can recover punitive damages if she shows that Vision Care/Eyeglass World discriminated against her with malice or with reckless indifference to her rights.   42 U.S.C. § 1981a(b)(1); *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999).   Under the ADEA, Lamb can recover liquidated damages if she can show defendant's violation was "willful."   29 U.S.C. § 626(b).   As previously discussed, there is a genuine issue of material fact as to whether Vision Care/Eyeglass World subjected Lamb to disparate treatment on the basis of age and sex.   Under both statutes, the question is essentially the same: whether Cook knew or should have known that his actions violated federal law.   See *Kolstad*, 527 U.S. at 536-37 (Title VII); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 616-17 (1993) (ADEA).   Defendant does not claim it believed it could lawfully discriminate based on sex or age, and there is no issue here of any good faith mistake as to what the law required.   See *Kolstad*, 527 U.S. at 536-37.   And with CEO Cook as the relevant decision-maker, there is no issue here about whether

the decision-maker was senior enough to hold the employer liable for his wrong-doing.  See *id.* at 544-46.  The evidence in this case requires that the questions of punitive damages under Title VII and liquidated damages under the ADEA be decided by the jury.


*Conclusion*


For the foregoing reasons, defendant's motion for summary judgment (Docket No. 47) is denied as to Lamb's age discrimination claim, sex discrimination claim, retaliation claim, and the issue of punitive/liquidated damages.  Vision Care, LLC, remains a properly named defendant in this action.  Defendant's motion for summary judgment is granted as to any time-barred disparate pay claims.  The case remains set for trial on August 13, 2007, with a final pretrial conference on August 3, 2007 at 10:00 a.m.


So ordered.

Date: July 2, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

John H. Haskin
HASKIN LAUTER LARUE & GIBBONS
jhaskin@hlllaw.com

James D. Masur II
ROBERT W. YORK & ASSOCIATES
jmasur@york-law.com

Jay  Meisenhelder
HASKIN LAUTER LARUE & GIBBONS
jmeisenhelder@hlllaw.com